United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NAVIGATORS SPECIALTY INSURANCE COMPANY, | Case No.  21-cv-05176-EMC   (EMC) |
| Plaintiffs, | **SUMMARY JUDGMENT** |
| v. | Docket Nos. 71, 72, and 74. |
| GOLDEN BEAR INSURANCE COMPANY, et al., | |
| Defendants. | |

## I.     INTRODUCTION

Plaintiff Navigators Specialty Insurance Co. ("Navigators") and Defendant Golden Bear Insurance Co. ("GB") each moved for summary judgment to determine whether GB was required to indemnify Navigators for a portion of the settlement in an underlying action which Navigators largely funded.  Additionally, Navigators moved for a partial motion of summary judgment against Republic West, Inc. ("REW") to establish REW's liability for a portion of the underlying settlement.  For the reasons provided below, Navigators motion for summary judgment against GB is DENIED, GB's motion for summary judgment against Navigators is GRANTED, and Navigators motion for partial summary judgment against REW is DENIED.

## II.     BACKGROUND

On December 28, 2011, REW entered into a Subcontract Agreement with general contractor New America Group, Inc. ("NAGI") for NAGI to serve as the electrical subcontractor for the Wisteria residential construction project in Concord, California (the "Project").  NAGI also hired Gonzalez, Inc. ("Gonzalez") as a subcontractor to install the guardrails.  First Amended Complaint ("FAC"), ¶ 2.

NAGI and REW entered into a Subcontract ("Subcontract"), drafted by NAGI, which delineated their respective obligations. Stipulation of Facts and Admissibility of Documents ("Stip"), 2:25-28. Both NAGI and REW obtained primary and excess insurance to protect their potential liability. NAGI obtained a primary policy and an excess policy from Navigators. Stip, 3:24-26; 4:1-3. Gonzalez obtained a primary policy from International Insurance Company of Hannover Se ("Hannover"). *Id*. at 4:4-6. REW obtained a primary policy from Hannover. *Id*. at 4:7-9. REW also obtained an excess policy from Golden Bear Insurance Co. ("GB"). *Id*. at 4:10-11. The GB-REW excess policy is excess over the Hannover REW primary policy. *Id*. at 4:12-13. NAGI is not explicitly named as an additional insured on either the Hannover-REW primary policy nor the GB-REW excess policy. The table below summarizes these coverages:

| Company: | NAGI | REW | Gonzalez |
|---|---|---|---|
| Primary insurer: | Navigators<br><br>($1,000,000 per occurrence and $2,000,000 in the aggregate) | Hannover<br><br>($1,000,000 per occurrence and $2,000,000 in the general aggregate) | Hannover<br><br>($1,000,000 per occurrence limit) |
| Excess insurer: | Navigators<br><br>($4,000,000 per occurrence and in the aggregate) | Golden Bear<br><br>($1,000,000 per occurrence and $2,000,000 in the aggregate) | |

Celerino Mejia ("Mejia") was an employee of REW. Stip, 3:1. On November 20, 2014, Mr. Mejia and another employee were installing electrical wiring at the Project on the second floor. *Id*. at 3:2-3. Mr. Mejia fell through the guardrail and was seriously injured suffering major head trauma. *Id*. at 3:18-19. Mr. Mejia does not remember the fall, and nobody saw him fall, but the mid-rail installed across the second-floor landing was detached on one side after the fall. *Id*. at 3:10-13. On November 15, 2016, Mr. Mejia filed a complaint for personal injuries and damages against NAGI and Gonzalez in the Superior Court of California. *Id*. at 3:13-15. In the action, Mr. Mejia contended that the temporary guardrail at the second-floor landing was defective, causing his fall. FAC, ¶ 1. REW filed a subrogation action against NAGI and Gonzalez seeking to

recover worker's compensation benefits it paid to Mr. Mejia in relation to the accident. Stip, 3:20-22. Mr. Mejia's personal injury action and REW's subrogation action were consolidated (hereinafter referred to as the "Underlying Action."). *Id*. at 3:22-23.

In the Underlying Action, NAGI moved for summary judgment, contending that there was no merit to the theories of negligence imposed against them. Br. for Def. NAGI at 2. The state court denied summary judgment and held that there were triable issues of material fact as to whether NAGI or Gonzalez were responsible for inspecting and maintaining the integrity of the guardrails. *Mejia v. New America Homes, Inc.*, at 22, 25, Case No. C16-02182 (2019). REW's potential liability was not discussed in the state court's order likely because REW was a plaintiff, and no cross claims were filed.

The state court found:

> It is undisputed that Gonzalez was the framing subcontractor for NAGI on the Wisteria Project and that it installed the safety guardrails in Lot 2, including the mid-rail at issue. It is also undisputed that the safety mid-rail was connected the day before the accident and detached the day after the accident. It is also undisputed that the mid-rail was negligently installed since there was only one nail holding the mid-rail in place on the side that detached, and the rail was too short for the span. From these undisputed facts, it is clear that the negligently installed guardrail was involved in the accident. Regardless of how the accident happened (except for suicide, for which there is no evidence), the guardrail should have prevented the fall.
> …
> It is disputed whether Gonzalez initially installed the guardrails properly and in compliance with Cal/OSHA regulations.
> …
> There is a factual dispute as to whether Gonzalez or NAGI was responsible for inspecting and maintaining the integrity of the guardrails.
> …
> It is disputed whether [NAGI's employee, Theodore Allen Nasca] did a competent job inspecting the guardrails on the landing prior to Mejia beginning his work there.

*Id*. at 16-17.[1]

After the accident, there were several inspections of the work site. Defendant's

---

[1] The parties have stipulated to the admissibility and use of the state court's order. Stip, p. 5-6 ("[T]he parties hereby stipulate and agree that the following documents are properly authenticated and admissible for all purposes in this lawsuit."). *See Garoutte v. Damax, Inc.*, 400 B.R. 208, 210 (S.D. Ind. 2009) (adopting the state court's facts). Navigators does not challenge the state court findings.

*United States District Court*
*Northern District of California*

superintendent, Theodore Nasca, went up on the landing where Plaintiff had been working soon after the accident. *Mejia*, Case No. C16-02182 at 4. He saw wires hanging down and that one side of the guardrail on the landing was detached. Specifically, he saw the mid-rail (*i.e.*, the lengthwise portion of the guardrail between the top rail and the floor of the land) detached at one end. *Id*.

On the second-floor landing, where Mr. Mejia was working, there were wires hangings from the vaulted ceiling and a detached mid-rail. *Id*. at 9. The opposite end of the mid-rail was toe-nailed to the post because the mid-rail itself was too short to span the full length of the landing. *Id*. Toe-nailing is a technique where the carpenter drives nails into the edges of a board at angles to secure it to another board. *Id*. It was done here because the board used for the bottom guard rail was too short to overlap with the stud to allow for proper nailing. *Id*. Plaintiff Mejia's expert, Gerald R. Fulghum, is a Safety and Board Certified Safety Professional with significant experience in construction safety. *Id*. at 10. He stated:

> The mid-rail had been toe-nailed at the end opposite from the one that dislodged, and the dislodged end had only been secured with one nail rather than the required two. … there is no doubt that the guardrail was negligently installed because in order to meet the above requirements, "a guardrail installer needed to use at least two nails on each end of a mid-rail to connect them to the wall studs, and the board needed to be long enough to allow for the ends of the mid-rail to fully overlap the wall studs." … Fulghum conclude[d] that Gonzalez breached the standard of care of a reasonable framing contractor. … Fulghum also opine[d] that the improperly installed mid-rail would have been "readily discoverable" by inspection.

*Id*. at 10-11.

NAGI's employee, Mr. Nasca, the superintendent on the project, was responsible for making "all the construction decisions." *Mejia*, Case No. C16-02182 at 8. He had "complete control over safety." *Id*. "Nasca was tasked with ensuring compliance with workplace safety rules and OSHA regulations, immediately abating safety hazards, performing daily safety inspections and holding safety meetings … and was in charge of inspecting the condition of the guardrails and also inspecting them for necessary maintenance." *Id*. Nevertheless, Mr. Nasca admits that he did not know what OSHA required regarding:

(1) the height of the guardrails, (2) the kind of material to be used for a guardrail; (3) whether toe boards were needed on elevated platforms; (4) the weight the guardrails were supposed to support, and (5) whether the guardrails were supposed to support downward or vertical force.  He also did not document his daily safety inspections.  Significantly, Nasca testified that a toe-nailed mid-rail was 'very strong' and was of 'very little' concern to him since the mid-rail would have provided 'lateral support.'"

*Id*. at 9 (citations omitted).   Additionally, Mr. Nasca informed the court that, sometimes, when other subcontractors, such as drywall, plumbing and electrical subcontractors, move materials into a home, they remove safety railings.  Mr. Nasca confirmed that "it was his job (and Gonzalez's) to make sure they were put back up."  *Id*. at 7.

Gonzalez's foreman on the Wisteria project was Miguel Magana.  Mr. Magana's duties included supervising the safety on the job site and doing daily safety inspections.  *Mejia*, Case No. C16-02182 at 7.  "Plaintiff points out that Gonzalez's foreman, Magana, left the Wisteria Project in October 2014, several weeks before Mejia was injured.  Plaintiff contends that there is no evidence that anyone else fulfilled Magana's responsibilities in his absence."  *Id*. at 8.

"REW was the electrical subcontractor for the Project, whose duties included furnishing and installing all electrical services, wiring, receptacles, switches, conduits, and other electrical fixtures."  *Mejia*, Case No. C16-02182 at 5.  The subcontract provides that REW "shall conduct inspections to determine that safe working conditions and equipment exists and accepts sole responsibility for providing a safe place to work for its employees … for adequacy of and required use of all safety equipment and for full compliance with the safety rules."  *Id*. at 6.

Additionally, immediately after the accident occurred, a Cal-OSHA inspector went to the work site and found that REW was in violation for failing to maintain adequate fall protection.  Under California Labor § Code 2320.8(a):

When work is performed at elevated locations more than 4 feet (1.2 meters) above the ground on poles, towers or similar structures, the employer shall require the employees to use either fall arrest equipment, work positioning equipment, or travel restricting equipment, if other fall protection methods have not been provided (e.g., guardrails, safety nets, etc.).

Stip. Ex. N, 13.  The violation was labeled as "Serious Accident-Related."  *Id*.  There are several elements that must be satisfied for this type of citation.  The table is provided below:

5

| Elements | Evidence Summary | Types of Evidence |
|---|---|---|
| When work is performed at elevated locations more than 4 feet (1.2 meters above the ground) | EE working on ladder above guardrails, approximately 18 feet above the ground | Photo |
| The employer shall require the employees to use either fall arrest equipment | No fall arrest used | Employer Written Statement |
| If other fall protection methods have not been provided (e.g., guardrails, safety nets, etc.) | EE working above the height of guardrails | Photo |

*Id*. at 11.

Thereafter, on June 28, 2019, the state court set the trial date in the Underlying Action for March 23, 2020.  Stip, 4:21-22.  In the Underlying Action, the Navigators and Hannover insurance policies covered NAGI.  NAGI was covered by Hannover under the Hannover-REW Primary Policy because, even though NAGI was not explicitly named as an additional insured on the Hannover-REW Primary Policy, Hannover conceded that NAGI was an additional insured under the Hannover-REW Primary Policy, as discussed below.  NAGI's defense counsel, Kevin Clarke, provided notice of potential excess liability exposure to GB on January 29, 2020.  *Id*. at 4:23-24.  On February 21, 2020, all prior defense status reports, pleadings, discovery, motion related materials, and deposition transcripts were provided to GB.  *Id*. at 5:1-2.  GB denied coverage to NAGI on February 28, 2020.  *Id*. at 5:3.  NAGI was not expressly named as an additional insured on the GB-REW Excess Policy.  Navigators and GB dispute whether NAGI is an additional insured on that policy pursuant to the terms of the relevant contracts.

The case settled before trial for $4.5 Million.  The settlement was funded by $1 Million from the Navigators-NAGI primary policy, $1 Million from the Hannover-REW primary policy, $1 Million from the Hannover-Gonzalez primary policy, and $1.5 Million from the Navigators-NAGI excess policy.  *Id*. at 5:4-7.  Navigators and Hannover's primary policies were exhausted to fund the first $2 Million of the underlying settlement.

In the case at bar, Navigators sued GB alleging that under the GB-REW Excess Policy, GB should have paid a portion of the settlement fund.  Additionally, Navigators sued REW alleging

1    that REW should pay a portion of the settlement fund given that it was responsible for maintaining

2    the safety of its employees and failed to do so and thus REW was responsible for contribution to

3    the settlement beyond that provided by its carriers.  *See* FAC, ¶ 44.

4        In Navigator's summary judgment motion against GB, Navigators asserts causes of action

5    for (1) Equitable Subrogation, (2) Equitable Contribution, and (3) Declaratory Relief against GB.

6    Pl. Mot. Summ. J. 12.

7        Alternatively, Navigators seeks partial summary judgment for Declaratory Relief against

8    GB under (1) their Duty to Indemnify NAGI in the Underlying Action and (2) GB's Primary Non-

9    Contributory Indemnity Obligation to NAGI.  *Id.*  Navigators argues that NAGI was an additional

10   insured under the GB-REW Excess Policy, such that GB is an insurer for NAGI's portion of the

11   settlement, which Navigators funded under its excess policy.  Navigators also argues that GB's

12   Excess Policy is primary to the Navigators-NAGI Excess Policy.  If NAGI is an additional insured

13   under the GB-REW Excess Policy and the GB-REW Excess Policy is primary to the Navigators-

14   NAGI Excess Policy, GB should pay $1 Million of the settlement (its policy limit is $1 Million).

15       GB filed a cross-motion for summary judgment.  Both parties agree that each of

16   Navigators causes of action hinge on whether the GB-REW Excess Policy covered NAGI.  The

17   only question posed to the Court is whether NAGI is an additional insured under the GB-REW

18   policy such that GB is liable for a portion of the underlying settlement.

19       Navigators also filed a partial motion for summary judgment against REW.  Navigators

20   asserts causes of action for (1) Equitable Subrogation and (2) Contractual Subrogation.

21   Navigators claims that it is subrogated to NAGI's rights, that REW is primarily liable for NAGI's

22   indemnity because REW is at fault for Mr. Mejia's injury, and thus REW is required to reimburse

23   Navigators for its share of the indemnity amounts.  Pl. Mot. Partial Summ. J. 13.  REW contends

24   that Navigators arguments fails because Navigator's evidence of REW's fault is inadmissible.

25   **III.    LEGAL STANDARD**

26   A. Summary Judgment

27       Federal Rule of Civil Procedure 56 provides that a "court shall grant summary judgment

28   [to a moving party] if the movant shows that there is no genuine dispute as to any material fact and

1   the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  An issue of fact is

2   genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party.

3   *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).  "The mere existence of a

4   scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could

5   reasonably find for the [nonmoving party]."  *Id.* at 252.  At the summary judgment stage, evidence

6   must be viewed in the light most favorable to the nonmoving party and all justifiable inferences

7   are to be drawn in the nonmovant's favor.  *See id.* at 255.[2]

8       Where a defendant moves for summary judgment based on a claim for which the plaintiff

9   bears the burden of proof, the defendant need only point to the plaintiff's failure "to make a

10  showing sufficient to establish the existence of an element essential to [the plaintiff's] case."

11  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

12      When parties file cross-motions for summary judgment, the court assesses each motion to

13  determine whether there are disputed issues of material facts relative to each motion.

14  **IV.    DISCUSSION – NAGI's Motion for Summary Judgement Against Golden Bear**

15  **and Golden Bear's Cross-Motion**

16      For the reasons set forward below, it is clear that NAGI was an additional insured under

17  the Hannover-REW Primary Policy pursuant to the terms of the Subcontract.  The question here is

18  whether NAGI was also an additional insured under the GB-REW Excess policy.  This question

19  turns on contract interpretation.

20      A.   Principles of Contract Interpretation Apply

21      California's substantive insurance law governs in this diversity case.  *State Farm Mut.*

22  *Auto. Ins. Co. v. Khoe*, 884 F.2d 401, 405 (9th Cir. 1989).  In California, insurance contracts are

23  interpreted under state law.  *Encompass Ins. Co. v. Coast Nat. Ins. Co.*, 764 F.3d 981, 984 (9th

24  Cir. 2014).  "While insurance contracts have special features, they are still contracts to which the

[2] Evidence may be presented in a form that is not admissible at trial so long as it could ultimately be capable of being put in admissible form.  *See* Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence"); *Fonseca v. Sysco Food Servs. of Ariz., Inc.*, 374 F.3d 840, 846 (9th Cir. 2004) ("Even the declarations that do contain hearsay are admissible for summary judgment purposes because they 'could be presented in an admissible form at trial'").

1   ordinary rules of contract interpretation apply." *Great Western Drywall, Inc. v. Interstate Fire &*

2   *Casualty Co.*, 161 Cal.App.4th 1033, 1040 (2008) (quoting *Stamm Theatres, Inc. v. Hartford*

3   *Casualty Ins. Co*, 93 Cal.App.4th 531, 538 (2001).

4        To interpret contract provisions, court are required "to look *first* to the language of the

5   contract in order to ascertain its plain meaning or the meaning a layperson would ordinarily attach

6   to it." *Waller v. Truck Ins. Exch., Inc.,* 11 Cal.4th 1, 18 (1995) (emphasis in original).  The whole

7   of a contract is to be taken together, so as to give effect to every part ... each clause helping to

8   interpret the other."  Cal. Civ. Code § 1641.  Courts "normally determine the mutual intention of

9   the parties 'from the written terms [of the contract] alone,' so long as the 'contract language is

10  clear and explicit and does not lead to absurd results.'"  *Revitch v. DIRECTV, LLC*, 977 F.3d 713,

11  717 (9th Cir. 2020) (quoting *Kashmiri v. Regents of Univ. of Cal.*, 156 Cal.App.4th 809, 67 Cal.

12  Rptr. 3d 635, 652 (2007)).  However, if there is an ambiguity in a contract which "is not

13  eliminated by the language and context of the policy, courts then invoke the principle that

14  ambiguities are generally construed against the party who caused the uncertainty to exist." *La*

15  *Jolla Beach & Tennis Club, Inc. v. Industrial Indemnity Co.*, (1994) 9 Cal.4th 27, 37.

16  "[A]mbiguous contract provisions should be construed against the drafter." *Int'l Bhd. of*

17  *Teamsters v. NASA Servs., Inc.*, 957 F.3d 1038, 1042 (9th Cir. 2020) (citing *Penthouse Int'l, Ltd. v.*

18  *Barnes*, 792 F.2d 943, 948 (9th Cir. 1986); *Jacobs v. Freeman*, 104 Cal. App. 3d 177, 189, 163

19  Cal.Rptr. 680 (1980)).

20        Unless there are disputed issues of facts which inform the interpretation of a contract (e.g.

21  as to applicable extrinsic evidence), questions of contract interpretation is a matter of law for the

22  court to decide.  *Wolf v. Superior Ct.*, 114 Cal. App. 4th 1343, 1359, 8 Cal. Rptr. 3d 649, 663

23  (2004), *as modified on denial of reh'g* (Feb. 19, 2004) (holding that the court's interpretation of

24  the contract as a matter of law is precluded when triable issues of fact remain regarding the proper

25  meaning to give terms or clauses); *Casey v. Metropolitan Life Ins. Co.*, 688 F.Supp.2d 1086, 1094

26  (E.D. Cal. 2010) (citing *United States v. Sacramento Mun. Util. Dist.,* 652 F.2d 1341, 1344 (9th

27  Cir.1981).) ("Interpretation of clear and unambiguous provisions in a contract is a question of law

28  for the court, allowing summary judgment/adjudication.").  For the reasons stated below, the

United States District Court
Northern District of California

9

contract interpretations here are an appropriate matter for the court to decide on summary judgment.

B. The GB-REW Excess Policy Incorporates by Reference the Underlying Hannover-REW Primary Policy

The GB-REW Excess Policy incorporates the Hannover-REW Primary Policy by reference.  The GB-REW Excess Policy contains the following language:

> II. APPLICATION OF UNDERLYING INSURANCE
> Except for the limits of liability and any provisions in the underlying insurance policy which are inconsistent with this Policy, including any endorsements attached hereto, *the terms, conditions, agreements, definitions, exclusions and limitations of the controlling underlying insurance policy are incorporated by reference as a part of this Policy.*

Stip. Ex. E, p. 1 (emphasis added).  GB does not dispute that the GB-REW Excess Policy incorporates by reference the underlying Hannover-REW Primary Policy.

C. NAGI Is Not an Additional Insured Pursuant to the GB-REW Excess Policy

The Court turns to the language of the policies in question.

1. NAGI is an Additional Insured Under the Hannover-REW Primary Policy

Because the Excess Policy incorporates the Primary Policy, the Court must first examine NAGI's status under the Primary Policy.  Although NAGI is not expressly named as an additional insured under the Hannover-REW Primary Policy, NAGI is an additional insured under the Hannover-REW Primary Policy.  The Primary Policy has an Additional Insured Endorsement which provides "who is an insured" under the contract:

> COMMERCIAL GENERAL LIABILITY COVERAGE PART
> A. Section II – Who is An Insured is amended to include as an insured any person or organization for whom you are performing operations *when you and such person or organization have agreed in writing in a contract or agreement* that such person or organization *be added as an additional insured on your policy.*  Such person or organization is an additional insured only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part by:
> 1. Your acts or omissions; or
> 2. The acts or omissions or those acting on your behalf; in the performance of your ongoing operations for the additional insured.
> …
> If required by written contract or agreement, such insurance as is afforded by this policy shall be primary insurance, and any insurance or self insurance maintained by the above additional insured(s) shall be excess of the insurance afforded to the Named Insured and shall not contribute to it.

1   Stip. Ex. D, pg. 85 (emphasis added).  This provision makes it clear that NAGI would only be an

2   additional insured under the Hannover-REW Primary Policy if REW and NAGI had a written

3   contract that stated that NAGI was to be added as an additional insured under the Hannover-REW

4   Primary Policy.  Therefore, the Court must look to the Subcontract between REW and NAGI.

5   *Carolina Cas. Ins. Co. v. Ortiz*, 2010 WL 55880 *6 (E.D. Cal. 2010) (citing *St. Paul Mercury Ins.*

6   *Co. v. Frontier Pacific Ins. Co.*, 111 Cal.App.4th 1234, 1245 (2003).) ("When additional insured

7   endorsements, by their own terms, depend on the existence of a written contract between the

8   named insured and the additional insured, the contract is a significant circumstance in determining

9   the objectively reasonable expectations of the additional insured.").

10      The Subcontract between REW and NAGI provides:

11   10. Insurance

12   (a) Subcontractor [REW] shall, at Subcontractor's [REW's] sole cost and expense and
        with insurers reasonably approved by Contractor [NAGI], maintain in full force and
13      effect for the entire term of this Subcontract:

14          (ii) *Commercial general liability insurance written on an occurrence basis,*
            *with limits of $1,000,000 per person per accident* and at least $1,000,000
15          property damage, or Combined Single Limit of at least $1,000,000 consisting of
            both bodily injury and property damage coverage and *including products*
16          *liability coverage and contractual liability expressly covering, without*
            *limitation, all of Subcontractor's obligations under paragraph 11* hereof,
17          including, but not limited to, the following coverage pursuant to ISO
            Endorsement No. CG-21-10-11-85, premises/operations, products/completed
18          operations, owners/contractors protective, independent contractors, blanket
            contractual liability, broad form property damage, personal injury, "X", "C",
19          "U" coverage, and liability for damages to property caused by blasting or
            explosion, collapse or structural injury to building or structure, and/or damage
20          to property below the surface of the ground.

21

22   (b) *Contractor [NAGI]*, and its parent, subsidiary, and affiliate companies and their
        officers, directors, and employees *shall be named as additional insureds under the*
23      *commercial general liability policy.*  The policy shall stipulate that the insurance afforded
        the additional insureds *shall apply as primary insurance and that any other insurance*
24      *carried by Contractor [NAGI], its officer, directors and employees will be excess only and*
        *will not contribute with this Insurance*. Subcontractor's liability insurance shall not be on a
25      "claims made" basis. All insurance policies required herein shall be issued by responsible
        insurance companies …
26

27   Stip. Ex. A, 29-30 (emphasis added).

28      NAGI is an additional insured under the Hannover-REW Primary Policy because (1) REW

11

was required to obtain "at least $1,000,000" in commercial general liability (CGL) insurance, *Id*. at 10(a)(ii), and (2) NAGI was to be "named as an additional insured under the commercial general liability policy." *Id*. at 10(b). The Hannover-REW Primary Policy covered REW for $1 Million of CGL insurance. Therefore, pursuant to the Subcontract, NAGI was an additional insured under the Hannover-REW Primary Policy. Hannover never disputed that NAGI was an additional insured under its policy, and Hannover paid its share of the settlement fund on behalf of NAGI accordingly.

      2.  <u>Whether NAGI is an Additional Insured Under the Excess Policy is Determined by the Criteria in the Primary Policy's Additional Insured Endorsement</u>

      As the GB-REW Excess Policy incorporates by reference the Hannover-REW Primary Policy, the threshold question is whether the GB-REW Excess Policy: (1) requires the application of the criteria set forth in the Hannover-REW Primary Policy Additional Insured Endorsement to the Subcontract between NAGI and REW specifically at issue, or (2) simply incorporates the ultimate fact that NAGI is an additional insured under the Hannover-REW Primary Policy.

      Although Navigators briefly mentions the second point in a sentence, Mot. 18:11-16, it never expressly advances or elaborates upon it. In fact, Navigators seems to concede that the proper analysis is the first point—Navigators focuses on the question of whether it was required to be an additional insured under the GB-REW Excess Policy pursuant to the terms of the Subcontract. Pl. Opp'n, 10 ("The dispute comes in interpretation of what exactly was agreed to in the written subcontract between [GB's] named insured REW and NAGI."). GB agrees with this framing of the issue.[3]

      3.  <u>NAGI is not an additional insured under the GB-REW Excess Policy</u>

---

[3] The parties' framing of the issue is apt. The incorporation clause imports the language of the Additional Insured Endorsement, not the outcome of its application with respect to the underlying policy. If NAGI had been expressly named as an additional insured on the Hannover-REW Primary Policy, literal incorporation would be appropriate. But NAGI was not so named. Applying the criteria of the Endorsement to the facts pertaining to the excess policy follows the court's analysis in *Colony Ins. Co. v. Gemini Ins. Co*, in which the court delved into a particularized analysis of the underlying subcontract to determine whether the subcontractor was an additional insured under the excess providers policy. No. C22-0394-JCC, 2023 WL 3740508 (W.D. Wash. 2023).

As previously discussed, the criterion the Hannover-REW Primary Policy's Additional Insured Endorsement provides:

> Who is An Insured is amended to include as an insured any person or organization for whom you are performing operations *when you and such person or organization have agreed in writing in a contract or agreement* that such person or organization *be added as an additional insured on your policy.*

Stip. Ex. D, pg. 85 (emphasis added). "When additional insured endorsements, by their own terms, depend on the existence of a written contract between the named insured and the additional insured, the contract is a significant circumstance in determining the objectively reasonable expectations of the additional insured." *Carolina Cas.*, 2010 WL 55880 at *6. Therefore, the Court turns to the Subcontract between REW and NAGI.

As noted above, the Subcontract between REW and NAGI provides:

> 10. Insurance
> (b) Subcontractor [REW] shall, at Subcontractor's [REW's] sole cost and expense and with insurers reasonably approved by Contractor [NAGI], maintain in full force and effect for the entire term of this Subcontract:
>
> > (ii)    *Commercial general liability insurance written on an occurrence basis, with limits of $1,000,000 per person per accident* and at least $1,000,000 property damage, or Combined Single Limit of at least $1,000,000 consisting of both bodily injury and property damage coverage and *including products liability coverage and contractual liability expressly covering, without limitation, all of Subcontractor's obligations under paragraph 11* hereof, including, but not limited to, the following coverage pursuant to ISO Endorsement No. CG-21-10-11-85, premises/operations, products/completed operations, owners/contractors protective, independent contractors, blanket contractual liability, broad form property damage, personal injury, "X", "C", "U" coverage, and liability for damages to property caused by blasting or explosion, collapse or structural injury to building or structure, and/or damage to property below the surface of the ground.
>
> (b) *Contractor [NAGI]*, and its parent, subsidiary, and affiliate companies and their officers, directors, and employees *shall be named as additional insureds under the commercial general liability policy.* The policy shall stipulate that the insurance afforded the additional insureds *shall apply as primary insurance and that any other insurance carried by Contractor [NAGI], its officer, directors and employees will be excess only and will not contribute with this Insurance.* Subcontractor's liability insurance shall not be on a "claims made" basis. All insurance policies required herein shall be issued by responsible insurance companies …

Stip. Ex. A, 29-30 (emphasis added).

GB argues that NAGI was only required to be named as an additional insured under the underlying CGL policy because the Subcontract only required REW to obtain a $1 Million CGL policy.  GB contends that the Subcontract did not require REW to obtain additional insurance in excess of that limit.  Navigators, however, argues that (10)(b) does require REW to obtain excess coverage insurance and name NAGI as an additional insured thereunder.

When performing contract interpretation, the court must assess terms for their "plain meaning" and the contract should be interpreted to give effect to the "mutual intention" of the parties.  *Waller v. Truck Ins. Exch., Inc.,* 11 Cal.4th 1, 18 (1995).  Pursuant to (10)(a) in the underlying REW-NAGI Subcontract, REW was required to obtain $1 Million in commercial general liability insurance.  ("Subcontractor [REW] shall, … maintain … Commercial general liability insurance … with limits of $1,000,000 …")  Stip. Ex. A, 29-30.  REW fulfilled its obligation under 10(a) and (b) of the underlying Subcontract.  REW obtained $1 Million per person per accident coverage in CGL insurance with the primary policy from Hannover, and NAGI was an additional insured thereon.  *Id.*  The Subcontract did not expressly require REW to obtain a policy in excess of $1 Million.  The fact that REW did obtain excess insurance, beyond its contractual obligation under 10(a), did not oblige REW to name NAGI an additional insured on such excess policy.

*Colony* is instructive here.  *Colony* presented similar facts.  After Superior Sole Fabrication & Welding, Inc. ("Superior"), a building remodeler, subcontracted with Saltaire Craftsmen ("Saltaire"), an individual fell through a rooftop deck of an apartment building which the companies had remodeled, and the individual sued.  No. C22-0394-JCC, 2023 WL 3740508, *1 (W.D. Wash. 2023).  Superior had general liability insurance with Defendant Gemini Insurance Company ("Gemini") and a commercial excess liability policy with Defendant Navigators.  *Id.*  Saltaire had a general and excess policy with Plaintiff Colony Insurance Company ("Colony").  *Id.*  The parties in the underlying lawsuit agreed to settle, and Superior and Saltaire agreed to pay $2,875,000 each.  *Id.*  Gemini and Navigators contributed on behalf of Superior and Colony contributed on behalf of Saltaire.  Subsequently, Colony filed suit against Gemini and Navigators, alleging it was improperly required to contribute the entire $2,875,000 settlement obligation owed

14

by Saltaire.  *Id.*  Navigators moved for summary judgment, contending that it was not required to

indemnify Colony because Saltaire was not an additional insured under its excess policy.  *Id.*

To determine whether summary judgment was appropriate, the court stated the relevant

provisions of the insurers' contracts:

> Under the Navigators policy, "who is an insured" is defined by the definition in the
> "controlling underlying insurance" policy.  Under the controlling underlying insurance,
> the Gemini Policy, (stating Gemini issued the underlying insurance policy), "who is an
> insured" includes "[a]ny person or organization when you have agreed in a written and
> executed contract, prior to an 'occurrence', that such person or organization be added as an
> additional insured on your policy."  The Gemini policy also states coverage required by
> contract or agreement "will not be broader than that which you are required by the contract
> or agreement to provide for such additional insured." The Navigators policy similarly
> states that "the Limits of Insurance available for the additional insured will be lesser of ...
> the amount of insurance [Navigators] is required to provide the additional insured in the
> written contract or agreement."

*Id.* at *2 (citations omitted).  The court turned to the underlying contract, between Saltaire and

Superior.  *Id.*  The underlying contract provided that Superior should obtain:

<u>General Liability</u>
<u>Occurrence</u> $1,000,000
<u>Aggregates</u> $2,000,000 Gen'l Agg
           $2,000,000 Prod/Co Agg

Additional Insured
Subcontractor's General Liability Policy must name [Saltaire] as an Additional Insured. …

*Id.*  Under the terms of the subcontract, "Superior was required to obtain general liability

insurance covering at least $1,000,000 per occurrence" and "Superior obtained such insurance

through the Gemini [primary] policy."  *Id.* at *3.  "Because the subcontract did not require

Superior to obtain insurance for Saltaire as an additional insured beyond $1,000,000 in general

liability per occurrence, Navigators was under no obligation to cover Saltaire as an additional

insured."  *Id.*

*Colony* is analogous to the case at bar.  REW was only required to obtain $1 Million in

CGL, which it did with its Hannover-REW Primary Policy.  REW was not required to obtain an

excess policy and therefore GB was not obligated to cover NAGI as an additional insured under

any excess policy.  To be sure, in *Colony,* the contract explicitly stated that Superior should obtain

"General liability: per occurrence $1,000,000," with no qualifier whereas, here, the Subcontract

provides that REW had to obtain CGL "with limits of $1,000,000 per person per accident and at least $1,000,000 property damage, or Combined Single Limit of at least $1,000,000 consisting of both bodily injury and property damage coverage." Stip. Ex. A, 29-30. But the requirement of "at least" $1 Million in Combined Single Limit did not *mandate* coverage *more* than $1 Million. Coverage of $1 Million fulfills the requirement of "at least" $1 Million. Thus, REW fulfilled its obligation of obtaining "at least" $1 Million when it obtained $1 Million in CGL coverage with Hannover. To be sure, *Colony* presents a slightly clearer case given that the subcontract there explicitly stated that "Coverage required by contract or agreement 'will not be broader than that which you are required by the contract or agreement to provide for such additional insured.'" *Id*. at 5-6. This language made it doubly clear there was no expectation of "broader" excess insurance above $1 Million. Nonetheless, *Colony* is still instructive. In *Colony*, the court stated:

> Here, the Navigators policy states it only applies to the extent required by contract. And although the contract has a clause allowing excess insurance to fulfill the subcontractor's insurance obligations, it does not *require* excess insurance. Because the Gemini policy fully met the insurance requirement, Navigators was not required to include Saltaire as an additional insured.

*Colony*, No. C22-0394-JCC, 2023 WL 3740508 at *3 (emphasis added). Colony's basic holding is that absent a clear contractual obligation to obtain excess insurance, Superior (like REW here) fulfilled its contractual obligation by obtaining $1 Million in primary coverage and naming the plaintiff as an additional insured thereon—regardless of whether Superior chose to obtain additional excess coverage for itself. The same is true of REW here.

Navigators, however, contends that the critical language is found in the sentence following the clause requiring CGL insurance of $1 Million: that language requires REW to obtain insurance for "bodily injury … coverage … expressly covering, *without limitation*, all of Subcontractor's obligations under paragraph 11 hereof …" Stip. Ex. A, 29-30 ¶ 10(a)(ii) (emphasis added). Paragraph 11 addresses REW's duty of indemnification and states that REW must indemnify NAGI for "any and all claims … of every kind and nature whatsoever … arising out of or in connection with this Subcontract." Stip. Ex. A, 30 ¶ 11(a). Navigators says that "without limitation" means that REW had to get insurance "without limitation," and therefore REW was required to get excess insurance under the terms of the contract because the duty of

United States District Court
Northern District of California

1  indemnification could well exceed $1 Million.

2      Navigator's interpretation of the provision is unpersuasive.  "Without limitation" refers to

3  the *scope* of the liability, not the magnitude of the insurance required.  As GB argues, it is evident

4  that "without limitation" refers to the scope of coverage because the remainder of the paragraph

5  lists policy coverage types and forms, which indicates that the paragraph pertains to the scope of

6  coverage, not to the policy limits of coverage.  Def. Opp'n, 12.  Here, the contract construction

7  principle *noscitur a sociis* applies:

> *Noscitur a sociis* means "a word takes meaning from the company it keeps."  Under this
> rule, "[a] word of uncertain meaning may be known from its associates and its meaning
> 'enlarged or restrained by reference to the object of the whole clause in which it is used.'"
> "In accordance with this principle of construction, a court will adopt a restrictive meaning
> of a listed item if acceptance of a more expansive meaning would make other items in the
> list unnecessary or redundant, or would otherwise make the item markedly dissimilar to the
> other items in the list."

12  *Almond Alliance of California v. Fish and Game Commission*, (2022) 299 Cal.Rptr.3d 9, 31.

13  "Without limitation" appears within a list of types of policy coverages:

> Commercial general liability insurance written on an occurrence basis, with limits of
> $1,000,000 per person per accident and at least $1,000,000 property damage, or Combined
> Single Limit of at least $1,000,000 consisting of both bodily injury and property damage
> coverage and including products liability coverage and contractual liability expressly
> covering, *without limitation,* all of Subcontractor's obligations under paragraph 11 hereof,
> including, but not limited to, *the following coverage pursuant to ISO Endorsement No.*
> *CG-21-10-11-85, premises/operations, products/completed operations, owners/contractors*
> *protective, independent contractors, blanket contractual liability, broad form property*
> *damage, personal injury, "X", "C", "U" coverage, and liability for damages to property*
> *caused by blasting or explosion, collapse or structural injury to building or structure,*
> *and/or damage to property below the surface of the ground.*

21  Stip. Ex. A, 29-30 (emphasis added).  The contract lists several types of coverages and liabilities

22  that REW was required to cover and/or indemnify; they address the scope of liability, and this

23  informs the meaning of "without limitation."

24      Further, as GB argues, the REW-NAGI subcontract states that REW is required to name

25  NAGI "as an additional insured under *the* commercial general liability policy."  Stip. Ex. A, 29-

26  30, ¶10(b) (emphasis added).  "The" in that sentence points to the CGL policy as mentioned above

27  in (a)(ii) which specifically says that the required coverage be a CGL insurance policy "with limits

28  of $1,000,000" per person per accident and nothing else.  *Id*. at ¶ 10(a)(ii).  The singular term

"the" indicates that NAGI was only required to be an additional insured on *the* CGL policy specified in 10(a) and nothing more.

Moreover, "[w]e normally determine the mutual intention of the parties 'from the written terms [of the contract] alone,' so long as the 'contract language is clear and explicit and does not lead to absurd results.'" *Revitch v. DIRECTV, LLC*, 977 F.3d 713, 717 (9th Cir. 2020) (quoting *Kashmiri v. Regents of Univ. of Cal.*, 156 Cal.App.4th 809, 67 Cal. Rptr. 3d 635, 652 (2007)). To read the "without limitation" language as informing the size rather than scope of coverage of insurance REW is obligated to obtain would be commercially unreasonable. Given its indefiniteness, it would mean that REW needed to obtain a potentially infinite amount of CGL insurance to cover any conceivable loss for which it must indemnify NAGI; it would imply a limit without any contractual specification, a commercially absurd result. It would also render the specification of $1 Million in CGL coverage largely useless. Cal. Civ. Code § 1641 ("The whole of a contract is to be taken together, so as to give effect to every part ... each clause helping to interpret the other.").

Finally, even if the "without limitation" clause were deemed sufficiently ambiguous to admit Navigator's proffered interpretation, "ambiguous contract provisions should be construed against the drafter," who, in this case, is NAGI because NAGI drafted the Subcontract. Stip, 2:25-28; *Int'l Bhd. Of Teamsters v. NASA Servs., Inc.*, 957 F.3d 1038, 1042 (9th Cir. 2020) (citing *Penthouse Int'l, Ltd. v. Barnes*, 792 F.2d 943, 948 (9th Cir. 1986); *Jacobs v. Freeman*, 104 Cal. App. 3d 177, 189, 163 Cal.Rptr. 680 (1980)). Because this is a subrogation action, Navigators stand in the shoes of NAGI. *See Ace Am. Ins. Co. v. Fireman's Fund Ins. Co.*, 2 Cal. App. 5th 159, 167, (2016) (quoting *Fireman's Fund Ins. Co. v. Maryland Cas. Co*., 65 Cal.App.4th 1279, 1291(1998)). Therefore, even if the provision is ambiguous, the ambiguous language should be construed against Navigators, and GB should not be liable for a portion of the settlement fund.

At bottom, the matter of interpreting the contracts at issue here are for the Court to decide. There are no disputed issues of fact which inform that interpretation. For the reasons stated above, NAGI was not an additional insured under the GB-REW Excess Policy.

### D.  Judicial Estoppel Does Not Apply

18

GB contends that Navigators should be judicially estopped in this action for taking a position that is inconsistent with the position it advanced in a recent case, *Colony*, No. C22-0394-JCC, 2023 WL 3740508 (W.D. Wash. 2023).  In *Colony*, Navigators prevailed on summary judgment arguing that it did not have an additional insured obligation to a general contractor as an excess provider to a subcontractor, which mirrors Navigators contrary position in this case, where it asserts that GB, an excess provider, has an additional insured obligation to NAGI pursuant to the terms of the Subcontract which is very similar to the subcontract in *Colony*.

Judicial estoppel is an equitable doctrine designed to "protect the integrity of the judicial process" and "prevent the improper use of judicial machinery."  *Continental Casualty Co. v. Chatz*, 591 B.R. 396, 411 (N.D. Cal. 2018) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749-50 (2001)).  It serves to "prohibit a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase."  *Id*.  Judicial estoppel bars litigants from making incompatible statements in two different cases.  *United Nat. Ins. Co. v. Spectrum Worldwide, Inc.*, 555 F.3d 772, 778 (9th Cir. 2009).  The position taken in both cases must be "clearly inconsistent" for judicial estoppel to apply.  In *United Nat. Ins.*, a company in a bankruptcy proceeding failed to list its claims against State Farm as assets on its bankruptcy schedules, and then later sued State Farm on the same claims.  *Id*. at 784.  They were barred under judicial estoppel from litigating those claims against State Farm.  In deciding a claim for judicial estoppel, there are three factors courts should consider:

> (i) Whether the party's later position is clearly inconsistent with its earlier position; (ii) whether the party succeeded in persuading a court to accept its earlier position, creating a perception that the first or second court was misled; and (iii) whether the party seeking to assert an inconsistent position derives an unfair advantage or imposes an unfair detriment on the opposing party.

*Id*. at 412 (citing *Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1134 (9th Cir. 2012)).

Although GB's argument is not without some force, Navigators' positions are not "clearly inconsistent" and therefore GB's claim for judicial estoppel is denied.  The *Colony* case and this case are similar, but they interpret two different contracts, one under Washington state law and one under California state law.

United States District Court
Northern District of California

First, contract law is governed by state law, and the cases were decided by two different state courts.  GB contends that this is not an issue, stating "it is the language of the contract, not a state or federal statute, that determines the outcome of these actions."  Def. Suppl. Br. 14.  That is simply not true.  Contract disputes are decided via contract interpretation, and contract interpretation is guided by state case law and statutes.  GB has not demonstrated that California and Washington state law on contract interpretation as applied to these cases are identical.

Second, the two cases interpret contracts with slightly different provisions.  Here, the Subcontract required REW to obtain "at least $1,000,000" in commercial general liability insurance and later stated that coverage should be "without limitation" to REW's indemnification obligations, a term not at issue in *Colony*.

### E.   Conclusion

Navigators' motion for summary judgment as to GB is DENIED, and GB's motion for summary judgement is GRANTED.

## V.   DISCUSSION - Navigators Motion For Partial Summary Judgement Against REW

### A.   Introduction

Navigators seeks an order of partial summary judgment against REW alleging (1) contractual subrogation and (2) equitable subrogation.  Pl. Mot. Summ. J. 13.  For both points, Navigators argues that because REW was at fault for the Underlying Action, it should have to bear a larger portion of the settlement payout.  Settlement of the Underlying Action was funded by $1 Million from the Navigators primary policy, $1 Million from the Hannover REW primary policy, $1 Million from the Hannover Gonzalez primary policy, and $1.5 Million from the Navigators excess policy.  Stip. 5:4-7.  Therefore, REW effectively only paid $1 Million of the settlement whereas Navigators paid $2.5 Million on behalf of NAGI.  Navigators contends that it should recover $2.5 Million from REW, because REW was primarily liable for Mr. Mejia's injury.  P. Mot. Partial Summ. J. 20.

### B.   Analysis

1.   Navigators has a Right of Recovery for Incurred Losses Caused by the Third Party

20

United States District Court
Northern District of California

1      As noted above, Navigators stands as the subrogated insurer to NAGI's rights as against

2  third parties such as REW.  *See Ace Am. Ins. Co.*, *supra,* 2 Cal. App. 5th at 167.  "In the insurance

3  context, subrogation takes the form of an insurer's right to be put in the position of the insured for

4  a loss that the insurer has both insured and paid."  *State Farm Gen. Ins. Co. v. Wells Fargo Bank,*

5  *N.A.*, 143 Cal. App. 4th 1098, 1106 (2006) (quoting *Fireman's Fund,* 65 Cal.App.4th at 1291–

6  1292).  When an insurance company pays out a claim on a property insurance policy, the

7  insurance company is subrogated to the rights of its insured against any wrongdoer who is liable to

8  the insured for the insured's damages.  *Id.*; *See Progressive West Ins. Co. v. Superior Court*, 135

9  Cal.App.4th 263, 272 (2005).

10      Under the terms of the Navigators-NAGI Primary Policy and the Navigators-NAGI

11  Excess Policy, Navigators is expressly provided with a right of recovery against third parties

12  where Navigators paid a loss.  The Navigators Primary Policy states:

> 8. Transfer of Rights of Recovery Against Other to Us
> If the insured has rights to recover all or part of any payment we have made under this
> Coverage Part, those rights are transferred to us.  The insured must do nothing after loss to
> impair them.  At our request, the insured will bring "suit" or transfer those rights to us to
> help us enforce them.

Stip Ex. B, pg. 29.  The Navigators Excess Policy states:

> 13. Transfer of Rights of Recovery Against Others
> If an insured has rights to recover all of part of any payment we have made under this
> insurance, the insured must preserve those rights and, at our request, pursue or transfer
> those rights to us.  The insured must do nothing after an 'event' to impair them.

Stip Ex. C, pg. 7.  By paying indemnity on behalf of NAGI to settle the Underlying Action,

Navigators has become contractually subrogated to NAGI's rights under the subcontract

agreements executed by REW.

      The question then is what obligation REW owed NAGI.  The parties' Subcontract

addresses the framework for this question:

> Further, REW was contractually obligated to indemnify NAGI:
> … Subcontractor [REW] agrees to indemnify … and hold harmless Contractor [NAGI] …
> from and against any and all claims, caused of action, liabilities, losses, costs, damages
> and/or expenses in law or equity … of every kind and nature whatsoever (collectively, the
> "Claims") arising out of or in connection with this Subcontract, the Work hereunder or any
> other work performed by Subcontractor at the Project Site provided that a Claim (i) *is*

*attributable to personal or bodily injury ... and (ii) is caused in whole or in part by any act or omission to act or willful misconduct by Subcontractor [REW],* anyone directly or indirectly employed by Subcontractor [REW] or anyone for whose acts Subcontractor [REW] may be liable, regardless of whether such injury, death or damage is caused or contributed to by any act or omission to act by Contractor [NAGI], anyone directly or indirectly employed by Contractor [NAGI], or anyone for whose acts Contractor [NAGI] may be liable.  Subcontractor's [REW's] obligation to indemnity and hold Contractor [NAGI] harmless shall apply with full force and effect regardless of any active and/or passive negligent act or omission by Contractor [NAGI] or its agents or employees and regardless of any concurrent negligence, whether active or passive, primary or secondary, by Contractor [NAGI] by anyone directly or indirectly employed by Contractor [NAGI], or by anyone for whose acts Contractor [NAGI] may be liable.

Stip. Ex. A, pg. 5 (emphasis added).  The critical question then is whether the injury to Mejia was

cause in whole or in part by REW acts or omissions.

    2.   REW Was Contractually Obligated to Maintain the Safety of Its Employees

REW was obligated under the REW-NAGI subcontract contract to maintain the safety of

its employees.  The subcontract provides:

Subcontractor [REW] shall, at its own cost and expenses, protect its employees ... from risk of death, injury, or bodily harm arising out of or in any way connected with Subcontractor's [REW's] Work, and Subcontractor [REW] shall strictly comply with all safety order, rules, regulations, etc. ... Subcontractor [REW] shall indemnify, defend, and save Contractor [NAGI] harmless from any liability, loss, cost, damage, or expense ... which Contractor [NAGI] may suffer or incur as a result of ... the alleged violation by Subcontractor [REW] of any such safety order, rule, etc. ... regardless of whether such violation is ultimately proven.

Stip. Ex. A, pg. 9.  Another provision states:

Subcontractor [REW] shall conduct inspections to determine that safe working conditions and equipment exist and accepts sole responsibility for providing a safe place to work for its employees ... and for full compliance with the Safety Rules.

Stip. Ex. A, pg. 34.

    3.   Navigators' Primary Evidence Against REW is Inadmissible

To recover under contractual subrogation, Navigators needs to show that REW breached

its obligations under the contract i.e. that it failed to ensure the safety of its employees.  In

asserting the record establishes REW breached its obligation as a matter of law, Navigators cites

evidence that REW failed under its obligation is an OSHA violation which is inadmissible under

California Labor Code § 6304.5.

Immediately after the accident occurred, a Cal-OSHA inspector went to the work site and

1 found that REW was in violation for failing to maintain adequate fall protection. Specifically,

2 REW violated California Labor Code § 2320.8(a), which provides:

3    When work is performed at elevated locations more than 4 feet (1.2 meters) above the
4    ground on poles, towers or similar structures, the employer shall require the employees to
     use either fall arrest equipment, work positioning equipment, or travel restricting
     equipment, if other fall protection methods have not been provided (e.g., guardrails, safety
5    nets, etc.).

6 Stip. Ex. N, 13. The OSHA inspector found that "the employer [REW] failed to provide means of

7 fall protection to an employee who was doing electrical work on a second floor platform. As a

8 result the employee fell causing a serious head injury." *Id*. The violation was label as "Serious

9 Accident-Related." *Id*. Navigators argues that this establishes REW's liability as a matter of law.

10 REW disputes this.

11    First, REW argues that the OSHA citation is inadmissible pursuant to the California Labor

12 Code. Def. Opp'n 6. Indeed, the California Labor Code states:

13
14    Neither the issuance of, or failure to issue, a citation by the [Occupational Safety and
      Health] division shall have any application to, nor be considered in, nor be admissible into,
      evidence in any personal injury or wrongful death action, except as between an employee
15    and his or her own employer.

16 CA Labor Code § 6304.5. Under this provision, the OSHA citation is inadmissible because this is

17 a personal injury action, and the parties are not in an employer/employee relationship.

18    However, Navigators argues that the Federal Rules of Evidence govern admissibility of

19 documents in this Court, so the California Labor Code is not dispositive on admissibility. Pl.

20 Reply 8. Navigators cites a Central District of California case, but that case doesn't contemplate

21 California Labor Code § 6304.5 which states that OSHA violations are inadmissible; the court

22 admitted the OSHA violation, but apparently neither party brought § 6304.5 to the court's

23 attention. *Ramirez v. ITW Food Equipment Group LLC*, 2018 WL 5816093 *2-3 (C.D. Cal.

24 2018). Other district courts have cited § 6304.5 without discussing the interplay between the

25 federal rules of evidence and § 6304.5. *See Lopez v. San Saba Vineyards, Inc.*, 2023 WL 4410507

26 *1 (N.D. Cal. 2023) (admitting the OSHA citation because § 6304.5 only bars admissibility of

27 OSHA citations as "evidence in any personal injury or wrongful death action" and this case was

28 not a personal injury or wrongful death action.); *Perez v. Auto Technology Co.*, 2015 WL

United States District Court
Northern District of California

12750274 *2 (C.D. Cal. 2015) (granting plaintiff's motion to exclude the OSHA citation based on § 6304.5.).

The Court concludes that § 6304.5 governs the admissibility of the OSHA citation.  In diversity cases, "a federal court must conform to state law to the extent mandated by the principles set forth in the seminal case of *Erie R.R. v. Tompkins*, 304 U.S. 64 (1938)." *Feldman v. Allstate Ins. Co.*, 322 F.3d 660, 666 (9th Cir. 2003).  "Pursuant to *Erie* and its progeny, federal courts sitting in diversity apply state substantive law and federal procedural law." *Id.* (citing *Erie*, 304 U.S. 64; *Wray v. Gregory*, 61 F.3d 1414, 1417 (9th Cir. 1995)).  The Ninth Circuit has stated:

> [S]tate evidence rules that are "intimately bound up" with the state's substantive decision making must be given full effect by federal courts sitting in diversity.  Moreover, some state law rules of evidence "in fact serve substantive state policies and are more properly rules of substantive law within the meaning of *Erie*."

*Feldman*, 322 F.3d at 666.

In *Feldman*, the Ninth Circuit held that California Penal Code § 632 is an exception to the general rule that the Federal Rules govern the admissibility of evidence in diversity cases.  *Id.* at 667.  There, § 632 made the taping of a confidential conversation a crime and limited the admissibility of illegally intercepted conversations in court.  *Id.*  § 632 "embodies a state substantive interest in the privacy of California citizens from exposure of their confidential conversation to third parties," and therefore, it "is properly characterized as substantive law within the meaning of *Erie*." *Id.*

Likewise, in *Wray*, a woman who underwent a medical treatment which resulted in her suffering brain damage, submit a medical malpractice case to a medical-legal screening panel, as Nevada law required.  61 F.3d at 1416.  The panel found there was no reasonable probability of medical malpractice.  The woman filed a diversity action in district court wherein the court admitted the panel's finding as evidence and, after the trial, the woman appealed in part based on the admissibility of the screening panel's findings.  *Id.*  The Ninth Circuit held that the panel's findings were inadmissible, because Nevada state substantive law makes clear that when a panel relies on expert medical testimony, it must make mention of that fact in its findings, and, here, the panel failed to do so.  *Id.* at 1418.  Nevada's interest in tailoring the form of medical malpractice

1   claims and the evidence that may be admissible along with it "is 'intimately related' to [Nevada's]

2   interest in establishing a scheme for resolving medical malpractice disputes" and disregarding

3   Nevada's rules in federal court "would encourage forum shopping." *Id*.

4        *Feldman* and *Wray* are instructive. Here, § 6304.5 is part of the California Labor Code and

5   states that OSHA violations are inadmissible in personal injury or wrongful death actions, except

6   as between an employee and his or her employer. *See* CA Labor Code § 6304.5. The California

7   legislature stated that making OSHA citations admissible in proceedings against employers spurs a

8   concern "that this admissibility may make OSHA develop regulations based on litigation concerns

9   and not [based on] worker safety." CA Bill Analysis, A.B. 1127 Sen., 8/17/1999. The

10  legislature's concern about litigation driving OSHA's policy is substantive. To be sure, the

11  legislature made an exception for suits between employers and employees, because of evidence of

12  "a series of horrifying and preventable accidents … in California following willful safety

13  violations." CA Bill Analysis, A.B. 1127 Sen., 9/03/1999. The legislature thus struck a balance

14  by ensuring that OSHA citations are admissible in wrongful injury actions against employers but

15  would be inadmissible in non-employer suits (as at issue in the instance case). But this balance

16  reflected a substantive policy decision by the California legislature.

17       Further, the OSHA citations are issued pursuant to California substantive labor law (and

18  not part of the evidence code) and "it would seem anomalous to allow citations issued pursuant to

19  a California statute to be used as evidence in federal court when they would not be admissible in

20  state court." *Dominguez v. Excel Mfg. Co. Inc.*, 2010 WL 4698738 *4 (N.D. Cal 2010).

21  California has evidenced its substantive interest in the enforcement of labor law and the role of

22  OSHA, an interest in insulating OSHA from litigation driven interests. Further, disregarding

23  California's rules in this case "would encourage forum shopping." *Wray*, 61 F.3d at 1418.

24  Therefore, the Court concludes that § 6304.5 applies in this case, and the OSHA citation is

25  inadmissible.[4]

26  _____

27  [4] Additionally, there are hearsay concerns even if the Federal Rules of Evidence were applied.
    The statement from the Employer Written Statement could fall within the public records exception

28  under FRE 803(8) but it is not clear that whoever gave the OSHA inspector the "employer written
    statement" on behalf of REW had authority to bind REW.

The only other evidence Navigators presents of REW's responsibility for the injury to Mr. Mejia is testimony given in the Underlying Action which indicated that while REW provided certain safety training to its employees, the trainings were reportedly done in English, and not in Mr. Mejia's primary language, Spanish.  Stip. Ex. R, p. 5.  But this evidence alone is insufficient to support a finding that REW thereby caused the accident, because there is no evidence of how much Mr. Mejia understood the directions and whether any failure to understand was a factor in the accident.  The alleged responsibility of REW for the accident on this record is left to speculation.

Indeed, it appears from the state court proceedings that responsibility for the accident could have been laid with NAGI.[5]

In the underlying action, the state court stated in its order for summary judgment:

> Regardless of how the accident happened (except for suicide, for which there is no evidence), the guardrail should have prevented the fall.
> …
> It is disputed whether Gonzalez initially installed the guardrails properly and in compliance with Cal/OSHA regulations.
> …
> There is a factual dispute as to whether Gonzalez or NAGI was responsible for inspecting and maintaining the integrity of the guardrails.
> …
> It is disputed whether [NAGI's employee, Theodore Allen Nasca] did a competent job inspecting the guardrails on the landing prior to Mejia beginning his work there.

*Mejia*, Case No. C16-02182 at 16-17.  It appears then that either Gonzalez or NAGI may have borne substantial responsibility for the accident.

Given the absence of any basis in admissible evidence that Mr. Mejia's injuries were caused in whole or in part by the act or omissions of REW, Navigators has failed to establish as a matter of law REW's liability.

### 4.   Navigators' Argument Regarding Contractual Subrogation Fails

For the reasons stated above, Navigators' contractual subrogation claim has not been

---

[5] The state court did not consider REW's liability, likely because REW was a plaintiff in the case, and the defendants did not file any cross claims.  Still, the state court's order suggests that, at the very least, the substantial or primary responsibility for Mr. Mejia's accident laid with NAGI and/or Gonzalez.

United States District Court
Northern District of California

1  established as a matter of law.

2         5.   Navigators' Equitable Subrogation Claim Fails

3         Equitable subrogation "is to be liberally applied to promote justice and does not

4  necessarily rest upon contract or privity but arises out of the nature of the contract of insurance as

5  a contract of indemnity." *St. Paul Fire & Marine Ins. Co. v. Murray Plumbing & Heating Corp.*,

6  65 Cal. App. 3d 66, 72 (1976).  At the same time, "[t]he doctrine of subrogation cannot be invoked

7  to override the contract of the parties.  It is not applicable where … its enforcement would be

8  inconsistent with the terms of the contract, or where the contract, either expressly or by

9  implication, forbids its application."  *Knight v. Alefosio*, 158 Cal. App. 3d 716, 724 (1984).

10  Equitable subrogation provides a "method of compelling the ultimate payment by one who in

11  justice and good conscience *ought* to make it—of putting the charge where it justly belongs."

12  *State Farm*, 143 Cal. App. 4th at 1105.  There are eight elements that are required for an equitable

13  subrogation claim:

14         [1] the insured suffered a loss for which the defendant is liable, either as the wrongdoer
15         whose act or omission caused the loss or because the defendant is legally responsible to the
        insured for the loss caused by the wrongdoer; [2] the claimed loss was one for which the
16         insurer was *not* primarily liable; [3] the insurer has compensated the insured in whole or in
        part for the same loss for which the defendant is primarily liable; [4] the insurer has paid
17         the claim of its insured to protect its own interest and not as a volunteer; [5] the insured has
        an existing, assignable cause of action against the defendant which the insured could have
18         asserted for its own benefit had it not been compensated for its loss by the insurer; [6] the
        insurer has suffered damages caused by the act or omission upon which the liability of the
19         defendant depends; [7] justice requires that the loss be entirely shifted from the insurer to
        the defendant, whose equitable position is inferior to that of the insurer; and [8] the
20         insurer's damages are in a liquidated sum, generally the amount paid to the insured.

21

22  *Pulte Home Corp. v. CBR Elec., Inc.*, 50 Cal. App. 5th 216, 229 (2020); *XL Specialty Insurance*

23  *Co. v. AIG Specialty Insurance Co.*, 2021 WL 3185451 *12 (C.D. Cal. 2021).

24         Here, REW would be liable to indemnify Navigators if it was liable and if equity would so

25  require.  However, as stated above, Navigators cannot show that as a matter of law REW caused

26  the loss.  There also appears to be a factual question whether the claimed loss was one for which

27  NAGI was *not* primarily liable.  As previously discussed, the facts laid forth in the state court

28  proceeding indicate that there is a question of whether Gonzalez breached the standard of care of a

United States District Court
Northern District of California

1    reasonable framing contractor, or whether Gonzalez, NAGI, or REW were responsible for

2    inspecting and ensuring the safety of the guardrails and safety equipment.  *Mejia*, Case No. C16-

3    02182 at 6-11.  Therefore, NAGI has failed to establish as a matter of law a claim for equitable

4    subrogation against REW.

5        C.  Conclusion

6        For the reasons stated above, Navigators' motion for partial summary judgment against

7    Defendant REW is DENIED.

8    **VI.    CONCLUSION**

9            Navigators' motion for summary judgment against Defendant GB is denied

10   because NAGI was not an additional insured under the GB-REW Excess Policy pursuant to the

11   terms of the Subcontract.  For the same reason, Golden Bear's motion for summary judgment

12   against Navigators is granted.  GB's motion for judicial estoppel based on the *Colony* case is

13   denied.  Finally, Navigators' partial motion for summary judgment against REW is denied because

14   Navigators failed to establish as a matter of law that REW was at fault for Mr. Mejia's accident.

15       The Court shall hold a status conference on Tuesday, January 16, 2024 at 2:30 P.M. before

16   the Honorable Edward M. Chen via Zoom webinar.

17

18       **IT IS SO ORDERED**.

19

20   Dated: January 4, 2024

21

22   _____

23   EDWARD M. CHEN
     United States District Judge

24

25

26

27

28